UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

JOSEPH KNOTT,                                       Case No. 09-CV-1098 (PJS/AJB)

            Plaintiff,

v.

AMFEC, INC., a Massachusetts corporation;
BACCETTI CORPORATION, a dissolved
California corporation f/k/a American Food
Equipment Company, Inc.; and AMERICAN
FOOD EQUIPMENT COMPANY, a                      ORDER
dissolved California corporation,

            Defendants.

AMFEC, INC., a Massachusetts corporation,

            Third-Party Plaintiff,

v.

JENNIE-O TURKEY STORE, INC., a
Minnesota corporation,

            Third-Party Defendant.

---

John T. Buchman and Susan E. Sheely, BARNA, GUZY & STEFFEN, LTD., for plaintiff.

Scott P. Drawe, DRAWE & MALAND, for defendant AMFEC, Inc.

Plaintiff Joseph Knott, an employee of third-party defendant Jennie-O Turkey Store, Inc. ("Jennie-O"), was injured while cleaning a large industrial blender at a Jennie-O processing plant in Willmar, Minnesota. Jennie-O purchased the blender in 1990 from its manufacturer, defendant American Food Equipment Company ("AMFEC I"). In 1997, AMFEC I sold all of its

assets to defendant AMFEC, Inc. ("AMFEC II").[1]  Knott now brings this product-liability action against AMFEC I, AMFEC II, and Baccetti Corporation.[2]

This matter is before the Court on AMFEC II's motion for summary judgment.  For the reasons set forth below, the motion is denied with respect to Knott's failure-to-warn claim and granted in all other respects.

I.  BACKGROUND

AMFEC I, the manufacturer of the blender, was a California corporation whose sole shareholder was Valerio Baccetti.  Reiser Aff. ¶ 8 & Ex. A at 9, Oct. 16, 2009 [hereinafter "Reiser Aff."].  In 1997, AMFEC II acquired all of AMFEC I's assets pursuant to an Asset Purchase Agreement.  *See* Reiser Aff. Ex. A at 9-171 [hereinafter "Agreement"].  AMFEC II is a Massachusetts corporation whose sole shareholders are George Reiser and Roger Reiser.  Reiser Aff. ¶¶ 3, 6.  Neither of the Reisers ever had any ownership interest in AMFEC I, and Baccetti has never had any ownership interest in AMFEC II.  Reiser Aff. ¶¶ 7-8.  Among the assets that AMFEC II purchased from AMFEC I was a manufacturing plant located in California, which AMFEC II still uses to manufacture blenders of essentially the same design.  Botto Dep. 76-77.

The Asset Purchase Agreement is governed by California law.  Agreement § 11.10.  Under the Asset Purchase Agreement, AMFEC II agreed to assume liability for certain enumerated contractual liabilities of AMFEC I.  Agreement § 1.2 & Sched. 1.2.  The parties

---

[1]AMFEC II was originally called AMFEC Acquisition Corporation; it later changed its name to AMFEC, Inc.  Reiser Aff. ¶¶ 2, 6, Oct. 16, 2009.

[2]AMFEC II purchased the exclusive right to use the name "American Food Equipment Company, Inc."  Reiser Aff. Ex. A § 7.1(a), Oct. 16, 2009.  Accordingly, AMFEC I changed its name to Baccetti Corporation before dissolving.  *Id.* at 277-78; Buchman Aff. Ex. G, Dec. 23, 2009.

expressly agreed that, with the exception of the enumerated contractual liabilities, AMFEC II would not assume any of AMFEC I's liabilities. Agreement § 1.2 ("Purchaser will not assume any liabilities not specifically enumerated in this Section 1.2."). On the same day that the parties entered into the Asset Purchase Agreement, they also executed an Assumption Agreement that provided, in relevant part: "Except as specifically provided for herein or in the [Asset Purchase] Agreement, Purchaser shall not assume, and shall have no responsibility with respect to, any obligations of Seller." Reiser Aff. Ex. A at 206. Neither the Asset Purchase Agreement nor the Assumption Agreement provide that AMFEC II would assume AMFEC I's liability for product-liability claims.

Although AMFEC II did not contractually agree to assume any of AMFEC I's tort liability, AMFEC II nevertheless agreed to maintain product-liability insurance for five years following the closing date to cover occurrences arising out of products sold before the acquisition. Agreement § 9.7. The insurance agreement was to name AMFEC I and Valerio Baccetti as additional insureds. *Id.* Pursuant to this provision, AMFEC II obtained a $10 million insurance policy that was in effect until December 1, 2002. Reiser Aff. Ex. A at 318, 321.

As noted, Jennie-O purchased the blender from AMFEC I in 1990. Botto Aff. ¶ 3, Oct. 13, 2009. The blender has a capacity of 3,000 pounds and is used to grind chicken parts. Buchman Aff., Dec. 23, 2009 [hereinafter "Buchman Aff."] Ex. I at 32 (MN OSHA inspection report). Jennie-O installed a catwalk around the blender for sanitation workers to use. *Id.* At the time of his injury, Knott was working as a sanitation worker on Jennie-O's night shift. *See id.* at 31. In the early morning hours of January 25, 2008, Knott was standing on the catwalk cleaning the blender with a high-pressure hose. *See id.* at 31-32. In accordance with Jennie-O procedure,

the blender was running while Knott cleaned it. *Id.* at 33. Unfortunately, Knott slipped on the catwalk, and his right hand entered the blender. Knott lost three fingers and part of his thumb. *Id.* at 35.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### B. Choice of Law

At issue in this motion is whether AMFEC II assumed the tort liability of its predecessor, AMFEC I. The parties agree that Knott's product-liability claims arise under Minnesota law. But the parties dispute whether California law or Minnesota law should determine the issue of whether AMFEC II succeeded to AMFEC I's tort liability.

Both Minnesota and California apply the traditional corporate-law rule that a purchaser does not assume the seller's liabilities merely by purchasing the seller's assets. *See J.F. Anderson Lumber Co. v. Myers*, 206 N.W.2d 365, 368 (Minn. 1973); *Ray v. Alad Corp.*, 560 P.2d 3, 7 (Cal. 1977). Likewise, both Minnesota and California recognize a number of

traditional exceptions to this general rule of purchaser nonliability, including: (1) the purchaser expressly or impliedly agreed to assume liability; (2) the transaction amounted to a consolidation or merger of the two corporations; (3) the purchasing corporation is a mere continuation of the selling corporation; and (4) the transfer of assets was for the fraudulent purpose of escaping liability. *J.F. Anderson*, 206 N.W.2d at 368; *Ray*, 560 P.2d at 7.

Where Minnesota and California part company is over the application of a more recent — and more controversial — exception to the traditional rule of purchaser nonliability: the "product-line" exception. Under the product-line exception, a successor corporation that continues to produce the same line of products may, in certain circumstances, be liable for injuries caused by a defective product in that line that was manufactured and sold by its predecessor. *Ray*, 560 P.2d at 5. California adopted the product-line exception in *Ray*, but Minnesota has quite emphatically rejected the exception. *Compare id. with Niccum v. Hydra Tool Corp.*, 438 N.W.2d 96, 99-100 (Minn. 1989). Knott argues that California's product-line exception should apply in this case.

Because this Court sits in Minnesota, it must apply the choice-of-law rules applied by Minnesota courts. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In determining which state's law to apply, Minnesota courts consider five factors: "(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law." *Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 470 (Minn. 1994).

1. Predictability of Result

The predictability factor is most relevant in contractual disputes and is intended to give effect to the contracting parties' expectations about what law will govern their transaction. *See Milkovich v. Saari*, 203 N.W.2d 408, 412 (Minn. 1973) (noting that predictability of result relates to consensual transactions where people should know in advance what law applies to their actions); *Lommen v. City of East Grand Forks*, 522 N.W.2d 148, 150 (Minn. App. 1994) (objective of predictability factor is to fulfill the parties' justified expectations). For that reason, the predictability factor is not ordinarily relevant in tort actions such as this lawsuit. *Milkovich*, 203 N.W.2d at 416; *Lommen*, 522 N.W.2d at 150; *Nesladek v. Ford Motor Co.*, 46 F.3d 734, 738 (8th Cir. 1995). Knott nevertheless argues that applying California's product-line exception would promote predictability because AMFEC I and AMFEC II chose California law to govern interpretation of the Asset Purchase Agreement — the document under which AMFEC II acquired AMFEC I's assets (and some of its liabilities). For that reason, Knott argues, applying California law to determine whether AMFEC II succeeded to AMFEC I's liabilities would be consistent with the parties' expectations.

If the issue of corporate-successor liability were solely a matter of interpreting the Asset-Purchase Agreement, the Court would agree that California law should govern. (Indeed, in accordance with the Agreement's choice-of-law clause, the Court will apply California law to determine whether and to what extent AMFEC II expressly or impliedly agreed to assume AMFEC I's liabilities.) But as many courts have explained, successor liability does not derive solely from contract or even from corporate law. *See Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 464 (3d Cir. 2006) (Alito, J.) ("While the basic tenet of successor liability law is based

in corporate law, the exceptions span a loose substantive continuum from contract to corporate to tort law.").

In particular, the product-line exception — at least as formulated and applied by California courts — is a creature of tort law, not of contract or corporate law. *See Ruiz v. Blentech Corp.*, 89 F.3d 320, 327 (7th Cir. 1996) ("California courts have quite clearly established that the [product-line] exception is a matter of products liability law, not corporate law."); *see also Van Doren v. Coe Press Equip. Corp.*, 592 F. Supp. 2d 776, 784 (E.D. Pa. 2008) ("The product line exception has indeed been traditionally analyzed as an issue of tort law."); *Savage Arms, Inc. v. W. Auto Supply Co.*, 18 P.3d 49, 53 (Alaska 2001) ("Successor liability is essentially an expansion of products liability law, which derives from tort principles of negligence and strict liability, and rejects contract-derived requirements such as privity."); *cf. Berg Chilling Sys.*, 435 F.3d at 465 (declining to characterize the substantive law of the product-line exception but describing it as an "explicitly tort-based exception" that is "analyzed using torts choice of law principles"). *But cf. Webb v. Rodgers Mach. Mfg. Co.*, 750 F.2d 368, 374 (5th Cir. 1985) (holding that California law applied to issue of successor's tort liability because the business entities involved were all Californian and all of the contacts between them occurred in California).

The AMFEC entities' choice of California contract law to govern the interpretation of the Asset Purchase Agreement is thus not particularly relevant here. *Cf. Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 687 (8th Cir. 2001) (holding that the language of an essentially identical choice-of-law clause was "not broad enough to govern the choice of law for the fraudulent concealment claim, which sounds in tort"). The question is not whether California

contract law should be used to interpret the Agreement; everyone agrees that it should. Instead, the question is whether a principle derived from California *tort* law should define AMFEC II's *non*-contractual obligations to someone who was not a party to the contract.

Obviously, this is not a question that the AMFEC entities could have resolved in the Asset Purchase Agreement. AMFEC II could not, for example, have defeated the application of Minnesota's product-liability law by agreeing in its contract with AMFEC I that California tort law would apply to claims brought against AMFEC II by plaintiffs (such as Knott) who were not parties to the contract. For that reason, the AMFEC entities' choice of California law to govern the interpretation of their contract has little bearing on the question whether California tort law should apply in determining whether AMFEC II is liable to Knott.[3] *See Berg Chilling Sys.*, 435 F.3d at 465-66 (holding that the corporations' choice of New Jersey law to govern their asset-purchase agreement did not resolve the question of which state's de-facto-merger exception should apply); *T.H.S. Northstar Assocs. v. W.R. Grace & Co.-Conn.*, 840 F. Supp. 676, 677-78 (D. Minn. 1993) (holding that Minnesota's de-facto-merger exception applied despite the contracting parties' choice of New York law), *aff'd in part, rev'd in part on other grounds*, 66 F.3d 173 (8th Cir. 1995); *cf. Ruiz*, 89 F.3d at 326-27 (applying California corporate law to determine successor liability because predecessor and successor were both California

---

[3]Knott contends that, under *Northwest Airlines, Inc. v. Astraea Aviation Services, Inc.*, 111 F.3d 1386 (8th Cir. 1997), a choice-of-law clause will govern tort claims that are "closely related" to contract claims. *Id.* at 1392. But the "closely related" tort claims at issue in *Northwest Airlines* were brought by one party to a contract against another party to the contract; indeed, those claims were essentially breach-of-contract claims restyled as torts. *Id.* That is not the case here.

corporations, but declining to apply California's product-line exception because that is a principal of tort law that Illinois courts have rejected).

The Court recognizes that, in a similar case involving an asbestosis claim, the Minnesota Court of Appeals found it relevant that the predecessor and successor corporations had chosen Pennsylvania law to govern the interpretation of their asset-transfer agreement. *Standal v. Armstrong Cork Co.*, 356 N.W.2d 380, 382 (Minn. Ct. App. 1984). The Court has its doubts about *Standal*. Crucially, however, the Minnesota Court of Appeals relied on two circumstances not present here: First, the court noted that the successor corporation had argued for the application of Pennsylvania law in a number of related asbestosis tort cases brought against it by non-parties to the contract. *Id.* Second, the court explained that the uniform application of Pennsylvania law by courts dealing with similar asbestosis claims against the successor would improve predictability and consistency among states. *Id.* For these reasons, the court explained, applying Pennsylvania law would be in accord with the parties' expectations and would promote predictability of result. *Id.*

There are no similar circumstances here, and thus no corresponding basis for finding that the application of California tort law would be in accord with AMFEC II's expectations. In this case, the fact that AMFEC I and AMFEC II agreed that California law would govern disputes between them about the meaning of their contract is irrelevant to the question of which state's law should govern a garden-variety tort action brought by Knott — a non-party to the contract — against AMFEC II. In sum, the predictability factor is of little relevance here. *Milkovich*, 203 N.W.2d at 416; *Lommen*, 522 N.W.2d at 150; *Nesladek*, 46 F.3d at 738.

### 2. Maintenance of Interstate Order

Knott next argues that California's product-line exception should apply because California has significant contacts with this case. *See Northwest Airlines*, 111 F.3d at 1394 (in examining maintenance of interstate order, courts look at the state's contacts with the issues being litigated). Knott points out that the blender was designed and manufactured in California by a California company. Although these circumstances are certainly relevant, they do not outweigh Minnesota's more significant contacts with this case. Knott is a Minnesota resident who was harmed in Minnesota at a Minnesota food-processing facility owned by a Minnesota corporation whose liability is also at issue in this case. *See* Buchman Aff. Ex. G, Aug. 18, 2009; Docket No. 9. Under these circumstances, applying Minnesota law would not show disrespect for California's sovereignty or encourage forum shopping. *See Northwest Airlines*, 111 F.3d at 1394. This factor does not favor application of either state's law.

### 3. Simplification of the Judicial Task

This factor has little significance in this case because the law of each state is clear and the Court can easily apply either state's law. *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 95 (Minn. 2000).

### 4. Advancement of the Forum's Interests

As noted, the accident occurred in Minnesota and the injured party is a Minnesota resident. The blender is owned by a Minnesota corporation and appears to be a permanent fixture in a Minnesota food-processing facility. Minnesota thus has a strong interest in having its product-liability standards apply in this case. In contrast, California has less interest in seeing its tort laws applied to extend liability to AMFEC II, which is a Massachusetts corporation, in

connection with a product manufactured in California long ago by a different corporation. Although AMFEC II continues to operate the manufacturing facility in California, Minnesota's interest is stronger than California's because the accident occurred in Minnesota and injured a Minnesotan. *Cf. Nodak Mut. Ins. Co.*, 604 N.W.2d at 92 (when all other relevant choice-of-law factors favor neither state's law, the state where a car accident occurred has the strongest governmental interest and that state's law should be applied). This factor points strongly to the application of Minnesota law.

### 5. Better Rule of Law

This factor is not considered unless the other factors do not resolve the choice-of-law issue. *See Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 455-56 (Minn. Ct. App. 2001). Because the fourth factor points strongly toward the application of Minnesota law and the remaining factors are neutral, the Court need not decide which state has the better rule of law. (If the Court were to reach that question, the Court would likely decide that the majority approach adopted by Minnesota is better than the minority approach adopted by California.) The Court therefore concludes that Minnesota law applies to the issue of AMFEC II's successor liability.[4]

### C. Successor Liability

As noted, Minnesota imposes liability on a successor corporation only in the following circumstances: (1) where the purchaser expressly or impliedly agrees to assume liability; (2) where the transaction amounts to a consolidation or merger of the two corporations; (3) where the purchasing corporation is a mere continuation of the selling corporation; and (4) where the

---

[4]Other than arguing that California's product-line exception should apply (and that the Asset Purchase Agreement should be construed under California law), Knott does not contest the application of Minnesota's law on successor liability.

transfer of assets is for the fraudulent purpose of escaping liability. *J.F. Anderson*, 206 N.W.2d at 368. Minnesota does not recognize the product-line exception, and thus the Court will not apply it. *Niccum*, 438 N.W.2d at 99-100.

Knott does not assert that AMFEC II is liable under either the "mere continuation" or "fraud" exceptions. Instead, he focuses on the "express or implied agreement" and "de facto merger" exceptions. The Court will address those exceptions in turn.

1. Express or Implied Assumption

Knott argues that AMFEC II agreed to assume the tort liability of AMFEC I. As this presents an issue of contract interpretation, the Court applies California law in accordance with the choice-of-law clause in the Asset Purchase Agreement. *See Northwest Airlines*, 111 F.3d at 1392 (Minnesota courts generally honor choice-of-law clauses).

Under California law, the mutual intention of the contracting parties governs interpretation. *State Farm Gen. Ins. Co. v. Mintarsih*, 95 Cal. Rptr. 3d 845, 852 (Cal. Ct. App. 2009). The parties' intention is generally determined from the written contract, but courts also consider the circumstances under which the contract was formed and the matter to which the contract relates. *Id.* Words are interpreted according to their ordinary and popular meaning and, if the language of the contract is clear, the plain meaning governs. *Id.*

Here, the AMFEC entities' intent with respect to AMFEC II's assumption of AMFEC I's liabilities could not be clearer: The Asset Purchase Agreement explicitly states that, with the exception of certain contractual liabilities which are not at issue here, AMFEC II is not assuming any of AMFEC I's liabilities. The AMFEC entities also expressly reiterated this point in an Assumption Agreement dated the same day as the Asset Purchase Agreement.

Knott nevertheless argues that AMFEC II *impliedly* assumed some of AMFEC I's tort liability because AMFEC II purchased five years' worth of product-liability coverage for occurrences arising out of products sold before the acquisition. This argument is not persuasive. AMFEC II's purchase of insurance is not evidence of an implied assumption of AMFEC I's tort liability because such liability can arise by operation of law even when a successor has not agreed to assume its predecessor's liabilities. For example, if the accident at issue here had occurred in California and had injured a California resident, there is a good chance that California's product-line exception would apply and that AMFEC II would be held liable, even though AMFEC II did not contractually assume AMFEC I's liabilities. The fact that AMFEC II bought insurance against the possibility of such liability merely demonstrates that the parties foresaw this possibility, not that they "impliedly" agreed to transfer AMFEC I's tort liability to AMFEC II.

Again, the parties' agreement expressly provides that AMFEC II did not assume AMFEC I's tort liability. It is one thing to read an implicit promise into a contract that is silent on a matter. But it is quite another thing to read an implicit promise into a contract that explicitly *rejects* any such promise. In light of the clear language of the Asset Purchase Agreement, the Court finds that AMFEC II did not assume — expressly or impliedly — any of AMFEC I's tort liability.

2. De Facto Merger

Knott next argues that the transfer of assets from AMFEC I to AMFEC II constituted a de facto merger. For this exception to apply, there must be a continuity of shareholders between the predecessor and the successor. *Fine v. Schwinn Cycling Fitness, Inc.*, No. 00-1079, 2000 WL 1869552, at *3 (Minn. Ct. App. Dec. 26, 2000) ("Without the element of shareholder continuity,

a de facto merger does not exist."); *Costello v. Unipress Corp.*, No. 95-2341, 1996 WL 106215, at *1 (Minn. Ct. App. Mar. 12, 1996) ("Without the key element of shareholder continuity Costello has failed to present an issue of material fact showing that the transfer of assets between the partnership and Unipress, Inc. constituted a de facto merger."); *Source One Enters., LLC v. CDC Acquisition Corp.*, No. 02-4925, 2004 WL 1453529, at *4 (D. Minn. June 24, 2004) ("Though no single factor is dispositive, a de facto merger requires the existence of a continuity of shareholders through a stock purchase."); *T.H.S. Northstar*, 840 F. Supp. at 678 (stating that, while not every factor bearing on de facto merger need be present, the key factor in distinguishing between a merger and an asset purchase is continuity of shareholders); *Everest v. Am. Transp. Corp.*, 685 F. Supp. 203, 206 (D. Minn. 1988) (continuity of shareholders is required for de facto merger); *cf. Niccum*, 438 N.W.2d at 99 ("If there is no continuation of the corporate entity — shareholders, stock, and directors — the successor corporation is not liable" under the mere-continuation exception); *J.F. Anderson*, 206 N.W.2d at 370 ("continuity of business, name, and management alone, is not, we think, sufficient basis for holding a transferee liable for the debts of the transferor").

Here, it is undisputed that AMFEC I and AMFEC II do not have, and have never had, any common shareholders. Consequently, the de-facto-merger exception does not apply.

The Court therefore concludes that none of the exceptions to the general rule of successor nonliability applies in this case. To the extent that Knott's claims rest on the argument that AMFEC II succeeded to AMFEC I's liabilities, his claims are dismissed.

### D. Failure to Warn

Knott argues that, whether or not AMFEC II succeeded to AMFEC I's liabilities, AMFEC II had an independent, post-sale duty to warn of dangers associated with its predecessor's products. AMFEC II disagrees, citing *Niccum* for the proposition that Minnesota does not recognize such a duty on the part of successor corporations. AMFEC II is mistaken.

In *Niccum*, the plaintiff sought leave to amend his complaint to assert a post-sale duty-to-warn claim against a successor corporation. *Niccum*, 438 N.W.2d at 100. The trial court denied permission on the ground that Minnesota does not impose such a duty on successor corporations. *Id.* Although the Minnesota Supreme Court affirmed the denial of the motion to amend, it did not do so on the basis that Minnesota does not recognize a duty to warn on the part of successor corporations. Instead, the court articulated a number of factors to consider in determining whether a corporate successor might have a post-sale duty to warn about dangers associated with its predecessor's products. These factors include:

> Succession to a predecessor's service contracts, coverage of the particular machine under a service contract, service of that machine by the purchaser corporation, [and] a purchaser corporation's knowledge of defects and of the location or owner of that machine . . . .

*Id.* (quoting *Travis v. Harris Corp.*, 565 F.2d 443, 449 (7th Cir. 1977)). After setting out these factors, the court explained that, under the facts of the particular case, the successor had no duty to warn. *Id.* at 100-01. The Court did not say that a successor *never* has a duty to warn. To the contrary, if Minnesota never imposed a duty to warn on a successor, there would have been no reason for the Court to identify and weigh the various factors.

Relying on *Niccum*, the Minnesota Court of Appeals has said that "[s]uccessor corporations have a duty to warn concerning a dangerous product manufactured by a predecessor corporation in certain situations." *Costello*, 1996 WL 106215, at *2; *see also Anderson ex rel. Anderson v. Shaughnessy*, 519 N.W.2d 229, 233 (Minn. Ct. App. 1994) (affirming denial of summary judgment on the issue of whether a successor corporation had a duty to warn), *rev'd on other grounds*, 526 N.W.2d 625 (Minn. 1995). Thus, contrary to AMFEC II's argument, Minnesota does indeed impose liability for failure to warn on successor corporations in certain circumstances. AMFEC II concedes that, if Minnesota recognizes such a duty, Knott is entitled to additional discovery on his failure-to-warn claim. AMFEC II's motion for summary judgment is therefore denied with respect to that claim.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant AMFEC, Inc.'s motion for summary judgment [Docket No. 38] is GRANTED IN PART and DENIED IN PART.

2. AMFEC, Inc.'s motion is DENIED with respect to plaintiff's failure-to-warn claim.

3. AMFEC Inc.'s motion is GRANTED with respect to plaintiff's remaining claims against AMFEC, Inc. Those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS with respect to AMFEC, Inc.

Dated: April 15, 2010

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge