UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JOSEPH KNOTT,

           Plaintiff,

v.

AMFEC, INC., a Massachusetts corporation;
BACCETTI CORPORATION, a dissolved
California corporation f/k/a American Food
Equipment Company, Inc.; and AMERICAN
FOOD EQUIPMENT COMPANY, a
dissolved California corporation,

           Defendants.

AMFEC, INC., a Massachusetts corporation,

           Third-Party Plaintiff,

v.

JENNIE-O TURKEY STORE, INC., a
Minnesota corporation,

           Third-Party Defendant.

Case No. 09-CV-1098 (PJS/AJB)

ORDER

    John T. Buchman and Susan E. Sheely, BARNA, GUZY & STEFFEN, LTD., for plaintiff.

    Scott P. Drawe, DRAWE & MALAND, for defendant AMFEC, Inc.

    Louise A. Behrendt and Michael S. Kreidler, STICH, ANGELL, KREIDLER, DODGE & UNKE, P.A.; Sblend A. Sblendorio and Jennifer M. Protas, HOGE FENTON JONES & APPEL, for defendant Baccetti Corporation.

    Plaintiff Joseph Knott, an employee of third-party defendant Jennie-O Turkey Store, Inc. ("Jennie-O"), was injured while cleaning a large industrial blender at a Jennie-O processing plant in Willmar, Minnesota. Jennie-O purchased the blender in 1990 from its manufacturer, defendant American Food Equipment Company ("AMFEC I"). In 1997, AMFEC I sold all of its

assets to defendant AMFEC, Inc. ("AMFEC II").[1]  AMFEC I then changed its name to Baccetti Corporation ("Baccetti") and dissolved.[2]

In this lawsuit, Knott is trying to find someone to compensate him for his injuries.  He appears to have negligence and other claims against Jennie-O, but he cannot sue Jennie-O because of the exclusivity provisions of the Minnesota Worker's Compensation Act.  Minn. Stat. § 176.031.  He also appears to have design-defect and other claims against Baccetti, but Baccetti has dissolved, and thus it appears unlikely that a judgment against Baccetti will do Knott much good.  So Knott has been struggling to find a way to recover from AMFEC II.  This has been a struggle because AMFEC II did not employ Knott, did not make the blender that injured Knott, and did not assume Baccetti's liabilities.

On April 15, 2010, this Court dismissed all of Knott's claims against AMFEC II, save Knott's claim that AMFEC II had an independent, post-sale duty to warn of dangers associated with its predecessor's products.  Docket No. 65.  The Court agreed with Knott that he was entitled to take discovery on that claim.  That discovery now being concluded, AMFEC II moves for summary judgment on Knott's failure-to-warn claim.  Baccetti also moves to dismiss all of Knott's claims against it.  For the reasons set forth below, AMFEC II's summary-judgment motion is granted, and Baccetti's motion to dismiss is denied.

---

[1]AMFEC II was originally called AMFEC Acquisition Corporation; it later changed its name to AMFEC, Inc.  Reiser Aff. ¶¶ 2, 6, Oct. 16, 2009.

[2]AMFEC II purchased the exclusive right to use the name "American Food Equipment Company, Inc."  Reiser Aff. Ex. A § 7.1(a), Oct. 16, 2009.  For that reason, AMFEC I changed its name to Baccetti Corporation before dissolving.  *Id.* at 277-78; Buchman Aff. Ex. G, Dec. 23, 2009.

I. BACKGROUND

The blender that injured Knott consists of a large rectangular tub (approximately eight to ten feet long and four feet wide) with two rotating augers (also called ribbon agitators) running lengthwise across the bottom of the tub. Buchman Aff., June 4, 2010 [hereinafter "Buchman Aff."] Ex. G (photographs), Ex. F at 32 (MN OSHA inspection report).[3] The blender has a capacity of 3,000 pounds and is used to grind poultry. Buchman Aff. Ex. F at 32. Materials are placed in the top of the blender and are discharged through doors at one end. Knott Dep. 72; Buchman Aff. Ex. J ¶ 6.1. The top of the blender is covered by a safety grate that is hinged in the middle and raises toward the center. Buchman Aff. Ex. F at 32. The blender has a kill switch that is supposed to prevent the blender from operating when the safety grate is open. Botto Dep. 21. The purpose of the safety grate is obvious: Someone who falls into the blender while it is operating can be severely injured.

The top of the blender is several feet high. AMFEC II knew that purchasers would likely install an elevated platform or catwalk next to the blender to make it easier to clean the blender. Dupaya Dep. 98. Consistent with this expectation, Jennie-O placed an elevated platform next to its blender for sanitation workers (such as Knott) to stand on while they cleaned the blender. Buchman Aff. Ex. F at 32.[4]

---

[3]The report prepared by the Minnesota Occupational Safety and Health Administration has inconsistent and overlapping pagination. The Court cites to the Bates stamps (e.g., "OSHA 000032"), but notes that they do not appear in the same location on each page.

[4]The exact height of the platform is not clear from the record. In one photograph, it appears that the top of the blender would be about knee-high to a person standing on the platform. Alsleben Dep. Ex. 2. But in other photographs, the top of the blender appears to be approximately waist-high. Knott Dep. Exs. 3, 4.

There does not appear to be any direct evidence that Jennie-O possessed an instruction manual for the blender at the time that Knott was injured. But Michael Botto, who was president of AMFEC I when Jennie-O purchased the blender in 1990 (and who is currently president of AMFEC II), attests that AMFEC I provided a manual with blenders sold in 1990. Botto Supp. Aff. ¶¶ 2, 4; Botto Dep. 47. The manual included various safety warnings and cleaning instructions. Botto Supp. Aff. Ex. F. Owners of blenders were advised that, when cleaning a blender, they should fill it with cleaning solution, run it, drain it, and give it a final rinse. Botto Supp. Aff. Ex. F at 8. The cleaning instructions also recommended that, before rinsing, users engage a locking mechanism and disconnect power to the blender. Botto Supp. Aff. Ex. F at 8. The manual further instructed users to ensure that the safety grate is in place before attempting to operate the blender and to keep hands away from the augers at all times. Botto Supp. Aff. Ex. F at 2. Again, the purpose of these warnings is obvious: Someone who fell into the blender while it was operating could be severely injured.

AMFEC I also placed warning decals on blenders that it sold in 1990. Botto Supp. Aff. ¶ 5. One of the decals allegedly placed on the blender included the following warnings:

CAUTION

> Do not operate, enter or do any other work on this machine until you have been trained and know the instruction manual.
>
> No work, cleaning or maintenance operation of any kind requires running this machine with any guard or cover removed. Stop the machine, disconnect and lock out the power source before attempting to remove any obstruction or doing any other work on this machine.
>
> Never run this machine with any guard or cover removed. You are responsible for the safe operation of this machine.

Botto Supp. Aff. Ex. G (the original is all in upper case; the Court reproduces it in upper and lower case for purposes of legibility). It is undisputed that this decal was not on the blender at the time of Knott's injury.[5] The manual instructed users to order replacement warning signs if they become lost, damaged, or illegible. Botto Supp. Aff. Ex. F at 3. Jennie-O either did not see this instruction or chose to ignore it.

At the time of his injury, Knott was a sanitation worker on Jennie-O's night shift. Buchman Aff. Ex. F at 31. Knott's job duties included cleaning the blender. Knott was taught by someone at Jennie-O — and not by anyone at AMFEC II — to start the blender, raise the safety grate, and hose down the interior of the blender while standing on the adjacent platform. Knott Dep. 86-87. Knott was not aware that the blender had a kill switch that was supposed to prevent the augers from rotating while the grate was open. Knott Dep. 90-91. That switch was apparently not operational, either because the switch was broken or because Jennie-O had altered the blender to defeat it. Jennie-O management denies any knowledge of its employees tampering with the switch, Alsleben Dep. 19-20, even though, as discussed below, there is evidence that a Jennie-O employee asked an AMFEC I employee for advice about how to defeat the switch — advice that AMFEC I refused to provide, Docket No. 104 at 3. There is no evidence that AMFEC II had any involvement in defeating the kill switch on the Jennie-O blender.

Knott was not given a manual for the blender, but he did read a warning sticker that cautioned workers not to put their hands near the discharge doors. Knott Dep. 72. During his training, Knott was told to keep his hands away from the augers, but he was not warned to stand

---

[5]At oral argument, Knott asserted that there is evidence suggesting that the decal had *never* been placed on the blender, but the Court could not locate any such evidence in the record.

back from the blender while it was operating.  Knott Dep. 99-100.  Based on his observation of the blender, though, it was obvious to Knott that coming into contact with the rotating augers would cause serious injury.  Knott Dep. 77-78.  Knott knew that it was important to keep his hands away from the interior of the blender while it was in operation.  Knott Dep. 77-78.

In the early morning hours of January 25, 2008, Knott was preparing to clean the blender.  As he had been instructed by Jennie-O, he raised the safety grate, started the blender, and retrieved the hose.  Knott Dep. 127-28, 133-34.  He was wearing rubber boots that were wet and had "junk" on the bottom of them.  Knott Dep. 139.  The platform was also wet.  Knott Dep. 139.  As Knott dragged the hose up the stairs and across the platform, the hose got caught on something.  Knott Dep. 132-33.  Knott pulled on the hose and, when the hose came loose, Knott lost his balance and slipped.  Knott Dep. 128, 133.  Knott's right foot went off the edge of the platform and his right arm entered the top of the blender.  Knott Dep. 138, 140.  His right hand became caught in the rotating augers, resulting in the loss of part of his hand.  Knott Dep. 128.

Botto, the president of AMFEC II, testified that he was aware, before Knott's accident, that customers sometimes defeated the kill switch.  Botto Dep. 42.  In his capacity as president of AMFEC I, Botto had sent several warning letters to customers that he knew were defeating the kill switch.[6]  Botto Dep. 42; Docket No. 104.  Indeed, Jennie-O received such a letter in 1994.

---

[6]In keeping with Knott's position that AMFEC I and AMFEC II should essentially be treated as a single company — an argument that the Court has rejected, *see* Docket No. 65 — Knott's counsel refused to distinguish between them during Botto's deposition.  *See* Botto Dep. 12.  In other words, Knott's attorney took discovery based on the assumption that the Court would rule in his favor on this hotly contested legal issue.  As a result, it is often not easy to tell when reading Botto's deposition which company is under discussion.  Although Botto testified generally that "we" sent letters about the kill switch, the only such letters in the record date from 1990, 1994, and 1996 — before AMFEC II acquired the assets of AMFEC I.  Docket No. 104 at

(continued...)

Docket No. 104 at 3. In the letter to Jennie-O, Botto recounted that a Jennie-O employee had asked an AMFEC I employee for technical information that would enable Jennie-O to defeat the kill switch. Docket No. 104 at 3. The AMFEC I employee had refused to provide the requested information and told Jennie-O that bypassing the kill switch "was very dangerous . . . ." Docket No. 104 at 3. Likewise, Botto advised Jennie-O that bypassing the kill switch "could cause serious injuries to employees," and Botto "strongly urge[d]" Jennie-O not to bypass any safety features in any way. Docket No. 104 at 3. In other words, the evidence in the record is that Jennie-O had looked for a way to defeat the kill switch on the blender that injured Knott, and that AMFEC I strongly advised Jennie-O not to do so.

In a similar letter sent to a North Carolina company in 1990, Botto noted that he had observed a worker cleaning the blender by climbing the "dumper" while the augers were rotating and the safety grate was open. Docket No. 104 at 7. Botto warned the company that this was unsafe. Docket No. 104 at 7. Finally, another letter, dated January 29, 1996, indicates that AMFEC I told the manager at a different Jennie-O plant that the kill switch on a mixer-blender had been bypassed; the manager told his employees to correct the problem.[7] Docket No. 104

---

[6](...continued)
3-9.

[7] After the hearing on AMFEC II's motion, AMFEC II produced additional materials to Knott, including the warning letters that AMFEC I sent to companies that were defeating the kill switch. Docket No. 104. Knott submitted these materials to the Court, and AMFEC II submitted a letter in response. Docket Nos. 104, 105. The Court has made these materials part of the record and has taken them into consideration in connection with AMFEC II's motion.

Because AMFEC II did not produce the warning letters until after the summary-judgment hearing, the parties briefed AMFEC II's motion as though Jennie-O had never received a letter warning about the kill-switch issue. For that reason, the parties have not addressed whether the
(continued...)

at 9. Botto testified that some customers continued to operate the blender without a functioning kill switch despite receiving a warning letter. Botto Dep. 43.

## II. ANALYSIS

### A. Baccetti's Motion to Dismiss

#### 1. Standard of Review

In reviewing a Rule 12(b)(6) motion, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008); *Maki v. Allete, Inc.*, 383 F.3d 740, 742 (8th Cir. 2004); *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 (8th Cir. 2003). Although the factual allegations in the complaint need not be detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, a Rule 12(b)(6) motion must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d). But the court may consider materials that are necessarily embraced by the complaint, as well as any exhibits attached to the complaint, without converting the motion into one for summary judgment. *Mattes*, 323 F.3d at 697 n.4.

---

[7](...continued)
letter fulfilled any duty AMFEC II may have had to warn of the danger of cleaning the blender with the augers rotating and the safety grate open.

2. Baccetti's Motion

Baccetti moves to dismiss the claims against it on the basis that, as a dissolved corporation with no undistributed assets, it cannot be sued. Baccetti's argument is based on a misreading of California law.[8]

California Corporations Code § 2010(a) provides that a dissolved corporation "nevertheless continues to exist for the purpose of . . . prosecuting and defending actions by or against it . . . ." California Corporations Code § 2011(a)(1), in turn, provides that a cause of action may be "enforced" against a dissolved corporation, whether or not it arose before or after the dissolution, to the extent of the corporation's undistributed assets.

These provisions make clear that, in contrast to the general common-law rule that a dissolved corporation cannot be sued, 16A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 8142 at 272-73 (2003), a dissolved California corporation can be sued and a plaintiff can recover to the extent of the corporation's undistributed assets. Contrary to Baccetti's suggestion, this does not mean that a dissolved corporation with no assets is immune from suit. *See King Case Indus. Co. v. Lemel Int'l Corp.*, No. B172525, 2005 WL 914203, at *6 (Cal Ct. App. Apr. 21, 2005) ("Whether the cause of action or judgment may be 'enforced' under section 2011 is different from whether it may be brought against the dissolved corporation under section 2010.").

---

[8]Both parties agree that, because Baccetti was a California corporation, the question whether it remains an entity capable of being sued is governed by California law.

Of course, as a practical matter, a plaintiff is unlikely to seek a judgment that he has no chance of collecting. But whether or not Baccetti has any assets is irrelevant to the legal issue of whether Knott may bring an action against it. Baccetti's motion to dismiss is therefore denied.

*B. AMFEC II's Motion for Summary Judgment*

1. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

2. AMFEC II's Motion

AMFEC II moves for summary judgment on Knott's failure-to-warn claim on the basis that the danger of cleaning the machine with the augers rotating and the grate open was obvious or "patent."[9] Under the "patent-danger doctrine," a manufacturer is relieved of its duty to warn

---

[9]The parties have not specifically addressed whether obviousness is a question of law or of fact. Both sides seem to treat it as a question of law inherent in the larger legal question of whether AMFEC II had a duty to warn. *See Huber v. Niagara Mach. & Tool Works*, 430 N.W.2d 465, 467 (Minn. 1988) (whether a manufacturer owes a duty to warn is an issue of law except where there is a specific factual dispute concerning the manufacturer's awareness of the risk). The Court follows suit, but notes that, even if obviousness were a question of fact, the Court would hold that a reasonable jury could come to only one conclusion: that the danger was obvious.

of a foreseeable danger if the danger would be obvious to anyone using the product. *Gamradt v. Fed. Labs., Inc.*, 380 F.3d 416, 419 (8th Cir. 2004); *Hart v. FMC Corp.*, 446 N.W.2d 194, 198 (Minn. Ct. App. 1989); *Mix v. MTD Prods., Inc.*, 393 N.W.2d 18, 19 (Minn. Ct. App. 1986).

Knott first argues that Minnesota rejected a strict application of the patent-danger doctrine in *Holm v. Sponco Manufacturing, Inc.*, 324 N.W.2d 207, 213 (Minn. 1982). But Knott reads *Holm* too broadly. *Holm* was a design-defect case, not a failure-to-warn case. Since *Holm* was decided, the Minnesota Court of Appeals and the Eighth Circuit have continued to apply the patent-danger doctrine in analyzing failure-to-warn claims under Minnesota law. *See Young v. Pollock Eng'g Grp., Inc.*, 428 F.3d 786, 792 (8th Cir. 2005) (holding that the manufacturer had no duty to warn of an obvious danger, but noting that the obviousness of the danger was not a complete bar to recovery under a design-defect theory); *Hart*, 446 N.W.2d at 198 (post-*Holm* case explaining that there is no duty to warn of obvious dangers); *Mix*, 393 N.W.2d at 20 n.2 (holding that *Holm* does not apply to failure-to-warn cases); *cf. Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 925 (Minn. 1986) (explaining that a duty to warn may exist where a risky misuse is foreseeable and "the manufacturer has no reason to believe that users will comprehend that risk"). *But see Omnetics, Inc. v. Radiant Tech. Corp.*, 440 N.W.2d 177, 182 (Minn. Ct. App. 1989) (stating in dicta that "*Holm* held that a manufacturer is not absolved of its responsibility to design a safe product, or to warn of its dangers, even though the dangerousness of the product is open and obvious to the consumer"). The Court therefore concludes that the patent-danger doctrine still applies in failure-to-warn cases.

The Court also concludes, based on its review of the record, that the danger posed by cleaning the blender with the safety grate open and the blender in operation was obvious.

Importantly, this is not a typical slip-and-fall case in which a plaintiff is suing a landowner for failing to correct a hazardous condition — such as a patch of ice or an uneven walkway — that caused the plaintiff to fall. Knott does not contend that anything about the *blender* caused him to fall, nor does he claim that AMFEC II is responsible for the particular conditions at the plant that caused him to fall. Thus, the condition of Jennie-O's platform — and whether that condition presented an obvious risk of slipping and falling — are irrelevant for purposes of this case. If anyone had a duty to warn about the slippery condition of Jennie-O's platform, it was Jennie-O.

As a result, Knott is left with the argument that AMFEC II should have warned him of the danger of cleaning the blender while it was in operation and while the safety grate was open. But the danger presented by that scenario is obvious. The blender is a big tub containing large rotating metal augers. When the safety grate is open, there is nothing to prevent a person from coming into contact with the rotating augers. A small child, standing next to the open blender, and peering down at the large rotating augers, would instantly know that, if he fell into the blender, he would be badly hurt.

Knott admitted as much. Knott testified that it was obvious that coming into contact with the rotating augers would cause serious injury:

> Q: And you understood just from observing [the blender] that if you put your hand or any other part of your body down in the area of those ribbon agitators you would get hurt?
>
> A: Obvious, yeah.
>
> Q: Even badly hurt?
>
> A: Yeah.

> Q: Did you understand even before you started working on it that it was important to keep your hands away from the ribbon agitator while it was in operation?
>
> A: Yeah.
>
> Q: Now, that was pretty obvious to you?
>
> A: Yeah. . . .
>
> Q: Did Mr. Ortiz do anything to impress upon you the importance of keeping your hands out of the tub while he was training you?
>
> A: No. Just obvious. You don't want to stick your hand in a running machine.

Knott Dep. 77-78, 103. Knott was also warned by Jennie-O to keep his hands away from the augers. Knott Dep. 99-100.

Knott makes much of the fact that he did not intentionally reach into the blender — i.e., that his contact with the augurs was accidental. Because he did not intentionally reach into the blender, Knott argues, his acknowledgment that it was "pretty obvious" that "it was important to keep your hands away from the [augurs]" is irrelevant.

This is sophistry. Knott argues, in essence, "It was obvious to me that if I reached into the blender, I would get hurt, but it was not obvious to me that if I fell into the blender, I would get hurt." Apparently, according to Knott, AMFEC II should have warned him that coming into contact with the rotating augurs after accidentally *falling* into the blender was as dangerous as coming into contact with the rotating augurs after intentionally *reaching* into the blender. This is akin to arguing that, while a car manufacturer has no duty to warn that intentionally driving a car off a cliff could be dangerous, it does have a duty to warn that accidentally driving a car off a cliff could be dangerous.

It is certainly conceivable that a manufacturer of an obviously dangerous machine could have a duty to warn of an *un*-obvious way of being exposed to that danger. For example, in *Parks v. Allis-Chalmers Corp.*, 289 N.W.2d 456 (Minn. 1979), the plaintiff's arm was suddenly pulled into a corn harvester while he was tugging on a stalk of corn that was clogging the machine. *Id.* at 459. The danger of an arm entering the inside of the harvester was obvious. What was not obvious, though, was that tugging on a corn stalk from outside the harvester was dangerous because the stalk could become dislodged and be pulled into the harvester so quickly that a person would not have time to let go. *Id.* at 460, 462. Thus, the Minnesota Supreme Court affirmed a judgment in the plaintiff's favor.

But this case is nothing like *Parks*. Parks was suddenly and unexpectedly pulled into a dangerous machine because of a hidden attribute of the machine itself. Knott, by contrast, fell into a large open tub that he was operating with the safety grate up and the augurs rotating. It is not obvious that grabbing the outside of a corn stalk stuck in a harvester is dangerous. But it is obvious that falling into a big open tub with two large rotating augers is dangerous.

Again, Knott cannot hold AMFEC II liable for the slippery conditions that caused him to slip and fall. Consequently, Knott is left to argue that AMFEC II was legally obligated to send a warning along the following lines to those who had purchased a blender years earlier from AMFEC I: "If you stand next to the blender with the safety grate up, you might fall, and if you fall, gravity will pull you down into the blender, and you'll get hurt." Even small children are presumed to know that people sometimes fall, that people who fall travel toward earth, and therefore that people standing next to dangerous objects need to be careful not to fall into those dangerous objects. *Cf. Sorensen v. City of Brooklyn Center*, No. C1-94-82, 1994 WL 272452, at

*3 (Minn. Ct. App. June 21, 1994) ("As a matter of law, [the six-year-old plaintiff] will be held to knowledge and appreciation of . . . the risk of landing on a plainly visible hard object when he fell."). Indeed, almost a half century ago, the Minnesota Supreme Court said that "[t]his court has said repeatedly that the operation of the law of gravity is a matter of such common knowledge that all persons of ordinary intelligence and judgment, even if they are illiterate, are required to take notice of it and that, therefore, there is no duty to warn against dangers which are obvious." *Rausch v. Julius B. Nelson & Sons, Inc.*, 149 N.W.2d 1, 7 (Minn. 1967).

Knott also argues that, although he may have been aware of the general danger presented by the blender, he did not appreciate the severity and likelihood of the threatened harm. *See Gamradt*, 380 F.3d at 419-21 (holding that knowledge of the general risk of minor smoke inhalation is not the same as knowledge of the risk of permanent and severe respiratory damage posed by the indoor use of a black-smoke grenade); *Louis v. Louis*, 636 N.W.2d 314, 321-22 (Minn. 2001) (explaining that, for a plaintiff to know of a risk, the plaintiff must appreciate the severity and probability of the threatened harm). It is hard to imagine how anyone could think that coming into contact with the large rotating augurs would cause only a minor cut or scrape. But, in any event, Knott clearly testified that he knew that he would be "badly hurt" if he came into contact with the rotating augers. And that is exactly what happened: He came into contact with the augurs, and he was badly hurt. Knott does not even try to explain how the injury that he suffered is more severe or less probable than the type of injury that one would normally expect to result from contact with the rotating augers. The Court therefore concludes that cleaning the blender while the safety grate was open and the blender was in operation posed an obvious risk about which AMFEC II had no duty to warn.

Perhaps recognizing the weakness of his failure-to-warn argument, Knott has raised numerous additional arguments, most of which are irrelevant to the issue of obviousness. For example, Knott repeatedly highlights evidence demonstrating that AMFEC II knew that its customers sometimes defeated the kill switch, that AMFEC II knew of customers who cleaned the blender while the safety grate was up and the augurs were rotating, and that AMFEC II's predecessor had previously warned customers of the dangers of these activities.[10] For the most part, Knott points to this evidence to argue that the risk was foreseeable. But AMFEC II is not arguing that the risk was unforeseeable. It is arguing just the opposite: That the risk was *obvious* — so obvious, in fact, that it was not only foreseeable to AMFEC II, but to Knott and everyone else who worked near the blender. *See Drager by Gutzman v. Aluminum Indus. Corp.*, 495 N.W.2d 879, 884 (Minn. Ct. App. 1993) ("even in the instance of an intended or reasonably foreseeable unintended use, a manufacturer has no duty to warn when the product user is aware of the risk" because the risk is obvious).

Although his argument is not entirely clear, Knott also seems to suggest that AMFEC II's knowledge of its customers' risky behavior gave rise to a duty to warn, even if the danger of that risky behavior was obvious to the customers engaging in the behavior. In this regard, it is noteworthy that Knott relies on both product-liability cases against manufacturers and premises-liability cases against property owners. In cases involving *premises liability*, the Minnesota

---

[10]Knott also emphasizes that AMFEC II knew that it was necessary to run the blender in order to clean it. This is somewhat misleading. There is no doubt that it was necessary to run the blender as part of the cleaning process; the instructions in the manual direct users to run cleaning solution through the blender. But this is not the same as saying that, to clean the blender, an employee must stand next to the blender while it is operating and the safety grate is raised.

Supreme Court applies the following formulation from the Restatement (Second) of Torts § 343A:

> "A possessor of land is not liable to his invitee for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness."

*Louis*, 636 N.W.2d at 319 (quoting *Baber v. Dill*, 531 N.W.2d 493, 495-96 (Minn. 1995)). "Thus, even for obvious dangers, a possessor has a duty to warn if harm to an invitee should be anticipated despite the obviousness of the danger." *Baber*, 531 N.W.2d at 496.

If this exception to the patent-danger doctrine applied in *product-liability* cases, AMFEC II's knowledge of its customers' risk-taking behavior could conceivably give rise to liability despite the obviousness of the danger. But Knott has not cited, and the Court has not found, any product-liability case in which this exception to the patent-danger doctrine has been applied. *Cf. Solo v. Trus Joist MacMillan*, No. 02-2955, 2004 WL 524898, at *8-9, *12 n.22 (D. Minn. Mar. 15, 2004) (denying summary judgment on failure-to-warn and premises-liability claims because there were factual issues concerning whether the plaintiff knew of the danger, and also denying summary judgment on the premises-liability claim because there were factual issues concerning whether the landowner should have anticipated the harm).

Moreover, the Court declines to find that the Minnesota Supreme Court would extend this exception beyond premises-liability cases. Minnesota case law regarding application of this exception in premises-liability cases is almost incoherent. As the Minnesota Court of Appeals wryly noted, "[a] cynic might suggest that our cases imply that where the danger is *really* obvious, there is no landowner duty, but where the danger is really, *really* obvious, there is a duty, yet, where the danger is really, really, *really* obvious, there is again no duty." *Davis v.*

*Walter*, No. A06-457, 2007 WL 3577, at *4 (Minn. Ct. App. Jan. 2, 2007). The Court doubts that the Minnesota Supreme Court would extend such an unwieldy doctrine to product-liability cases, which are exponentially more common than premises-liability cases. To hold that manufacturers have a post-sale duty to warn customers of risks that are obvious would impose an onerous burden on manufacturers, with little corresponding benefit to consumers. (A consumer who ignores an obvious risk is likely to ignore a letter warning him of that obvious risk.) The Court therefore concludes that AMFEC II's knowledge of its customers' risky behavior is not relevant to the issue of obviousness.

Finally, Knott continues to criticize the blender's design. For example, Knott emphasizes that a person's arm can fit through the safety grate. This would be irrelevant even if AMFEC II had designed the blender, as the safety grate was *open* at the time that Knott was injured. More importantly, though, AMFEC II did *not* design the blender, and this Court has already dismissed Knott's design-defect claim against AMFEC II. "Failure to warn is a cause of action separate from defective design." *Huber v. Niagara Mach. & Tool Works*, 430 N.W.2d 465, 467 (Minn. 1988). Thus, Knott's criticisms of the blender's design by AMFEC I simply have nothing to do with AMFEC II's motion to dismiss the failure-to-warn claim.

Because the risk created by cleaning the blender with the safety grate open and augers rotating was obvious, the Court grants AMFEC II's motion for summary judgment and dismisses Knott's post-sale failure-to-warn claim.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant AMFEC, Inc.'s motion for summary judgment [Docket No. 68] is GRANTED.

2. Plaintiff's failure-to-warn claim against defendant AMFEC, Inc. is DISMISSED WITH PREJUDICE AND ON THE MERITS.

3. Defendant Baccetti Corporation's motion to dismiss [Docket No. 74] is DENIED.


Dated: October 18, 2010           s/Patrick J. Schiltz
                                      Patrick J. Schiltz
                                      United States District Judge